FILED
United States Court of Appeals
Tenth Circuit

July 15, 2016

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

TRANSAM TRUCKING, INC.,

Petitioner,

v.

ADMINISTRATIVE REVIEW
BOARD, UNITED STATES
DEPARTMENT OF LABOR,

Respondent.
_____

ALPHONSE MADDIN,

Intervenor.

No. 15-9504
(LABR No. 13-031)

_____

ORDER AND JUDGMENT[*]

_____

Before **GORSUCH**, **MURPHY**, and **McHUGH**, Circuit Judges.

_____

I.      Introduction

Alphonse Maddin was employed as a truck driver by Petitioner TransAm

Trucking ("TransAm").  In January 2009, Maddin was transporting cargo through

_____

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Illinois when the brakes on his trailer froze because of subzero temperatures. After reporting the problem to TransAm and waiting several hours for a repair truck to arrive, Maddin unhitched his truck from the trailer and drove away, leaving the trailer unattended. He was terminated for abandoning the trailer.

Both an administrative law judge ("ALJ") and Respondent, the Department of Labor ("DOL") Administrative Review Board ("ARB"), concluded Maddin was terminated in violation of the whistleblower provisions of the Surface Transportation Assistance Act ("STAA"). He was ordered reinstated with backpay. TransAm filed a Petition for Review of the ARB's Final Decision and Order with this court. Exercising jurisdiction pursuant to 49 U.S.C. § 31105(d), we **deny** the petition for review.

## II.    Factual Background

Maddin was employed by TransAm as a truck driver. In January 2009, he was driving a tractor-trailer for TransAm on I-88 in Illinois. At approximately 11:00 p.m., Maddin pulled to the side of the highway because he was unable to find the TransAm-mandated fuel station and his gas gauge was below empty. When he attempted to pull back onto the road ten minutes later, he discovered the brakes on the trailer had locked up because of the frigid temperatures.

Maddin reported the frozen brakes to TransAm at 11:17 p.m. and was advised by TransAm's Road Assist service that a repairperson would be sent to his location. While waiting for the repair truck, Maddin discovered that his

auxiliary power unit ("APU" or "bunk heater") was not working and there was no heat in the cab of the truck.

Maddin eventually fell asleep in the truck but was awakened at approximately 1:18 a.m. when he received a telephone call from his cousin, Gregory Nelson. According to Nelson, Maddin's speech was slurred and he sounded confused. When Maddin sat up, he realized his torso was numb and he could not feel his feet. He called Road Assist again and told the dispatcher his bunk heater was not working. He also told the dispatcher about his physical condition and asked when the repairperson would arrive. The dispatcher told Maddin to "hang in there."

About thirty minutes after his second call to Road Assist, Maddin became concerned about continuing to wait in the freezing temperatures without heat. He unhitched the trailer from the truck, pulled the truck about three feet away, and called his supervisor, Larry Cluck.[1] Maddin told Cluck he couldn't feel his feet and was having trouble breathing because of the cold. Cluck repeatedly told Maddin to turn on the APU even though Maddin told Cluck several times it was not working.

When Maddin told Cluck he was leaving to seek help, Cluck told Maddin not to leave the trailer, instructing him to either drag the trailer with its frozen

---

[1]Larry Cluck died prior to the hearing before the ALJ. Documents in the record spell Mr. Cluck's last name as both "Cluck" and "Kluck." We utilize the spelling set forth in the transcript of the hearing before the ALJ.

brakes or remain with the trailer until the repairperson arrived. Maddin did not

follow either instruction but, instead, drove off in the truck leaving the trailer

unattended. The repair truck arrived less than fifteen minutes after Maddin left.

Maddin drove the truck back to the trailer and met with the repairperson.

After the repairs to the brakes were completed, Maddin called Cluck for

instructions on where to purchase fuel. During this conversation, Cluck

threatened to write Maddin up for either a late load or for missing his fuel stop

earlier. During a subsequent conversation, Cluck informed Maddin he was being

written up for abandoning the trailer. Less than a week later, Maddin was fired

for violating company policy by abandoning his load while under dispatch.

After his termination, Maddin filed a complaint with OSHA, an agency

within the DOL, asserting TransAm violated the whistle-blower provisions of the

STAA when it discharged him. After the complaint was dismissed by OSHA,

Maddin requested a hearing before a DOL ALJ. 49 U.S.C. § 31105(b)(2)(B). The

ALJ issued a written interim decision and order on October 26, 2012, ruling that

Maddin was terminated in violation of the STAA. Specifically, the ALJ

concluded Maddin engaged in protected activity when he reported the frozen

brake issue to TransAm and again when he refused to obey Mr. Cluck's

instruction to drive the truck while dragging the trailer. The ALJ further

concluded Maddin's protected activity was a contributing factor in TransAm's

decision to fire him because Maddin's refusal to operate the truck while dragging

the trailer was "inextricably intertwined" with TransAm's decision to terminate him for abandoning the trailer at the side of the highway. The ALJ provided Maddin with an opportunity to present evidence of economic damages.

The ALJ issued a final decision and order on January 7, 2013, awarding backpay to Maddin in an amount calculated from the date of his discharge to the date of his reinstatement. Included in the award were per diem travel allowances which the ALJ concluded were part of Maddin's compensation. Maddin's interim earnings were not deducted based on the ALJ's finding that those earnings were more than offset by interim expenses that Maddin would not have incurred but for his termination. The ALJ also ordered TransAm to take steps to remove all negative reports made to any entity about Maddin or his termination.

TransAm appealed the ALJ's decision to the ARB. The ARB affirmed the ALJ's interim and final decisions, concluding that substantial evidence supported all the applicable findings. The Board also affirmed the amount of backpay.

## III. Discussion

### A. *Standard of Review*

This court reviews the final order of the ARB under the standards set out in the Administrative Procedure Act ("APA"). 49 U.S.C. § 31105(d); 5 U.S.C. § 706. Under those standards, this court will affirm the ARB's decision if it is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted); *see also Phillips Petroleum Co. v. FERC*, 786 F.2d 370, 373 (10th Cir. 1986) ("The scope of review under section 706 depends upon . . . whether the agency action is an adjudication or a formal rulemaking, in which case the standard of review is the substantial evidence standard . . . ."). The APA standard of review is narrow and highly deferential to the agency. *Compass Envtl., Inc., v. Occupational Safety & Health Review Comm'n*, 663 F.3d 1164, 1167 (10th Cir. 2011). Deference is also given to the DOL's legal interpretation of the STAA because Congress has explicitly delegated to the Secretary of Labor authority to enforce the whistle-blower provisions of the STAA by formal adjudication, 49 U.S.C. § 31105(b), and the Secretary has delegated that enforcement authority to the ARB.[2] *See* Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 67 Fed. Reg. 64,272, 64,272 (Oct. 17, 2002); *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001) (holding *Chevron* deference is appropriate when it appears from the "statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute" as when Congress "provides for a relatively formal administrative procedure"); *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984) (holding an agency's interpretation of a

_____

[2]TransAm has not argued that the ARB's legal conclusions are not entitled to *Chevron* deference because its decision is not "binding precedent within the agency." *Efagene v. Holder*, 642 F.3d 918, 920 (10th Cir. 2011).

statute it administers is owed deference by courts when "the statute is silent or ambiguous" on the issue in question and the agency's reading represents a "permissible construction of the statute").

   B.    *The STAA Claim*

The complaint provision of the STAA prohibits an employer from discharging an employee because the employee "has filed a complaint or begun a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order." 49 U.S.C. § 31105(a)(1)(A)(I). The ARB upheld the ALJ's finding that Maddin engaged in protected activity under this provision when he notified TransAm about the frozen brakes, concluding the finding was supported by substantial evidence. TransAm challenges the ARB's conclusion that "uncorrected vehicle defects, such as faulty brakes, violate safety regulations and reporting a defective vehicle falls squarely within the definition of protected activity under STAA." TransAm argues Maddin's report of frozen brakes is not a complaint of the type the STAA seeks to protect because Maddin was simply communicating a concern about defective brakes, a condition that in and of itself does not constitute a violation of any statute or regulation. It is unnecessary to resolve this issue because the ARB's ruling can be affirmed under an alternative provision of the STAA also relied upon by the ARB.

That alternative provision is codified at 49 U.S.C. § 31105(a)(1)(B)(ii) and makes it unlawful for an employer to discharge an employee who "refuses to

operate a vehicle because . . . the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition." For an employee's apprehension of serious injury to be reasonable, the employee must show that a reasonable individual in the employee's circumstances "would conclude that the hazardous safety or security condition establishes a real danger of accident, injury, or serious impairment to health." *Id.* § 31105(a)(2). An employee seeking protection under this provision must also show that he "sought from the employer, and [was] unable to obtain, correction of the hazardous safety or security condition." *Id*. TransAm does not dispute that Maddin had a reasonable apprehension of serious injury if he either stayed with the trailer or dragged the trailer down the highway. Neither does TransAm dispute that the trailer's frozen brakes were unsafe and Maddin, who had been waiting more than three hours in freezing temperatures in an unheated truck, was unable to obtain correction of the unsafe condition.

The ARB agreed with the ALJ's finding that Maddin engaged in protected activity under this provision when he unhooked the trailer and "refused to operate the truck under the conditions set by Mr. [C]luck." TransAm argues that because Maddin drove the truck after being instructed to "stay put," he actually operated his vehicle and the ARB erred by concluding his conduct fell within the "refusal to operate" provision of the STAA. Because we are reviewing the DOL's interpretation of a statute it administers, we begin by asking "whether Congress

has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. Here, the term "operate" is not defined in the statute. "If . . . Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Id.* at 843 (footnote omitted). Instead, we examine "whether the agency's [interpretation] is based on a permissible construction of the statute." *Id.*

TransAm's argument equates the term "operate," as used in the statute, with driving. However, TransAm has not directed this court to any authority for the proposition that Congress intended the refusal-to-operate provision of the STAA to be interpreted so narrowly, and has not explained how such a narrow interpretation furthers the purposes of the STAA. The ARB interpreted the term "operate" to encompass not only driving, but other uses of a vehicle when it is within the control of the employee.[3] Thus, under the ARB's interpretation, the refusal-to-operate provision could cover a situation in which an employee refuses to use his vehicle in the manner directed by his employer even if that refusal results in the employee driving the vehicle. Thus, by way of example, an employee who partially unloads an overweight trailer in direct contravention of his employer's instruction to continue pulling the overweight trailer on the public

---

[3]The language used by the ARB—particularly its statement that "'a refusal to operate' may encompass actually operating a vehicle"—is somewhat confusing, but its meaning is clear when read in context.

roadways, has refused to operate the vehicle for purposes of the STAA even if the employee completes the trip after unloading the trailer. *See Beveridge v. Waste Stream Envtl., Inc.*, ARB No. 97-137, 1997 WL 806522, at *1 (ARB Dec. 23, 1997). Similarly, an employee who moves a disabled trailer from the middle of a busy roadway to the shoulder of the road after being told by his employer to remain in the roadway, has refused to operate his vehicle for purposes of the STAA whistle-blower protection under the interpretation of § 31105(a)(1)(B)(ii) adopted by the ARB.

The STAA was enacted, *inter alia*, to "promote the safe operation of commercial motor vehicles," "to minimize dangers to the health of operators of commercial motor vehicles," and "to ensure increased compliance with traffic laws and with . . . commercial motor vehicle safety and health regulations and standards." 49 U.S.C. § 31131(a). The STAA's whistle-blower provisions were enacted to "encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258 (1987). The ARB's interpretation of § 31105(a)(1)(B)(ii) furthers the purpose of the STAA by prohibiting an employer from discharging an insubordinate employee whose insubordination was motivated by the employee's reasonable apprehension of serious injury to himself or members of the public.

Thus, we defer to the DOL's interpretation that the term "operate" as used in

§ 31105(a)(1)(B) is not coextensive with the term "drive."[4]

Having concluded the ARB's interpretation of § 31105(a)(1)(B)(ii) is a

permissible construction of the statute, we also conclude the ARB's finding that

Maddin engaged in STAA-protected activity when he unhitched the trailer and

---

[4] The dissent takes issue with our application of *Chevron* to the question before us, deeming it an "uninvited foray into step two of *Chevron*land." Dissenting Op. at 2. We received our invitation from TransAm in its opening brief. Appellant Br. at 13 n.5. TransAm, the appellant in this matter, relied on *Chevron* to argue the ARB's construction of the STAA should be rejected.

The dissent further criticizes us for moving to the second prong of the *Chevron* analysis after concluding the term "operate" is not defined in the statute. The dissent believes Congress's intent can be easily determined by simply choosing a favorite dictionary definition of the word and applying that to quickly conclude the statute is not ambiguous at all. However, in addition to not defining the term "operate," Congress also did not unambiguously express its intent with regard to the definition of the term. *See United States v. Seminole Nation of Okla.*, 321 F.3d 939, 944 (10th Cir. 2002). Thus, the only way to resolve the matter we have been asked by TransAm to review is to move to *Chevron*'s second step.

Even if we disregard TransAm's request that we analyze this case using the *Chevron* paradigm and employ the analysis used by the dissent, we would still reach the same conclusion. We, too, have found a dictionary definition of the word "operate" and discovered it means to "control the functioning of." *Operate*, Oxford Dictionaries Pro, http://www.oxforddictionaries.com/us/definition/american_english/operate (last visited July 8, 2016). This definition clearly encompasses activities other than driving. For that reason, the dissent's conclusion that a truck driver is "operating" his truck when he refuses to drive it but not when he refuses to remain in control of it while awaiting its repair, is curious. The only logical explanation is that the dissent has concluded Congress used the word "operate" in the statute when it really meant "drive." We are more comfortable limiting our review to the language Congress actually used. As the dissenting judge stated during oral argument, "Our job isn't to legislate and add new words that aren't present in the statute."

drove off in the truck is supported by substantial evidence. Here, Mr. Cluck instructed Maddin to either drive his truck while dragging the trailer or stay with the trailer on the side of the roadway until the repairperson arrived. Maddin refused to obey either instruction given by Mr. Cluck and, instead, unhooked the truck from the trailer and drove off, leaving the trailer unattended—the very thing Mr. Cluck ordered him not to do.

As to Maddin's refusal to drag the trailer, TransAm argues that dragging the trailer was a "ridiculous alternative option" and, thus, Maddin could not refuse to operate his vehicle under the conditions set by his employer because it was impossible to do so. TransAm's argument is unpersuasive. First, both the ALJ and the ARB accepted Maddin's uncontroverted testimony that Mr. Cluck ordered him to drag the trailer with the frozen brakes. Further, TransAm has not directed this court to any evidence in the record demonstrating that dragging the trailer was impossible. It is true that Maddin testified he could not release the brakes because they were frozen. But Maddin did not testify that he seriously attempted, but was unable, to drag the trailer.

Because the refusal-to-operate provision can be interpreted to cover multiple uses of a vehicle while it is in the control of an employee, the ARB did not err in concluding that Maddin's act of unhitching the trailer and driving off in the truck was a refusal to operate the tractor-trailer for purposes of § 31105(a)(1)(B)(ii). Maddin was instructed by Mr. Cluck to operate his rig by

-12-

remaining with the trailer until the repairperson arrived. He disobeyed that instruction and drove off in the truck, leaving the trailer behind. Thus, as the ARB concluded, although Maddin actually drove the truck after unhitching it, he refused to operate his tractor-trailer in the manner instructed by his employer. This conclusion is supported by substantial evidence.

TransAm also raises two challenges to the ARB's finding that the protected activity in which Maddin engaged was a contributing factor in his termination. 29 C.F.R. § 1978.109(a) (providing a complainant must demonstrate by "a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint"); *see also* 49 U.S.C. § 42121(b)(2)(B)(I) (requiring a complainant to make a prima facie showing that his protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint"); 49 U.S.C. § 31105(b) (incorporating the burdens of proof set out in 49 U.S.C. § 42121(b)). Maddin's protected activities included (1) refusing to drag the tractor-trailer and (2) refusing to remain with the trailer. According to TransAm, Maddin's refusal to drag the trailer did not contribute to his termination because it "is simply not credible" to conclude he was terminated for failing to "defy the laws of physics." Maddin's refusal to remain with his trailer did not contribute to his termination because, TransAm argues, that conduct was not a refusal to operate his vehicle and, thus, was not protected activity. TransAm's arguments are duplicative of the arguments it made

-13-

with respect to the issue of whether Maddin engaged in protected activity. For the same reason those arguments were unpersuasive as to the protected activity issue, they are unpersuasive as to the issue of whether Maddin's protected activity contributed to TransAm's decision to terminate his employment.

Direct evidence that Maddin was terminated for refusing to operate his vehicle under the conditions set by his employer consists of TransAm's admission that Maddin was terminated for abandoning the trailer.[5] The ARB concluded that "Maddin's refusal to either drag the trailer or remain with the trailer [were] inextricably intertwined with the adverse action taken against him (termination for abandoning the trailer)." Thus, the ARB concluded the stated explanation for Maddin's termination necessarily implicates his protected activities. The ARB's causation finding is also supported by indirect evidence, namely the close temporal proximity of Maddin's protected activity with his termination and the shifting explanations given by Mr. Cluck for why he intended to write Madden up on the day of the incident. We have no difficulty concluding the ARB's causation finding is supported by substantial evidence.

----

[5]Although TransAm accuses Maddin of violating federal regulations and Illinois state law by failing to turn on the hazard warning signal flashers and placing warning devices when he abandoned his trailer, TransAm has never asserted that Maddin was terminated for that reason. *See* 49 U.S.C. 42121(b)(2)(B)(ii) (requiring an employer to demonstrate by clear and convincing evidence that it would have taken the same action against the complainant in the absence of his protected activity).

C.    *The Backpay Award*

The STAA clearly states that an employer who violates the statute shall be ordered to "pay compensatory damages, including backpay with interest."  49 U.S.C. § 31105(b)(3)(A)(iii).  In its final order, the ARB concluded Maddin was entitled to reinstatement and backpay with interest.  TransAm raises three challenges to the backpay award.

In its first challenge, TransAm argues Maddin's backpay award should not include a per-diem travel allowance of $168.58 per week.  The ALJ awarded this amount after concluding "the precise nature" of the payments was "unclear" from the record.  Noting that the allowances were paid whenever Maddin was driving for TransAm and did not appear from the pay stubs submitted by TransAm to be intended to offset expenses, the ALJ ruled they were properly included in Maddin's lost earnings.  The ARB upheld the ALJ's determination, concluding it was supported by substantial evidence.  TransAm does not dispute that the allowances were paid whenever Maddin drove for TransAm but it asserts the travel allowances were "specifically designed to reimburse Maddin for expenses that he would naturally incur on days when he drove for TransAm."  TransAm's argument can be quickly rejected because its appellate brief contains no citation to any record evidence that supports this assertion.[6]  Neither has TransAm

_____

[6]TransAm was aware this evidence was relevant because the ALJ noted that the record contained no evidence that the per diem allowances were intended to

(continued...)

directed this court to any evidence that Maddin was required to use the payments he received to offset his actual expenses. Accordingly, we conclude the ARB's ruling that the per diem travel allowances were properly included in Maddin's lost wages is supported by substantial evidence.

The income Maddin earned from 2010 to 2012 was not deducted from his backpay award based on the ARB's finding that this income was less than the business expenses Maddin incurred to earn it. TransAm challenges this finding, arguing it is not supported by the evidence. Specifically, TransAm argues that Maddin failed to produce any evidence he incurred business expenses that completely offset his income during the relevant period.

---

[6](...continued)
offset expenses. The ALJ also noted the per diem payments were not subject to withholding. TransAm argues this shows the payments were not compensation. While it is true that some per diem payments are not subject to withholding and employment taxes, TransAm has not specifically stated what type of reimbursement plan was at issue here. *See* 26 C.F.R. §§ 1.62-2(c)(3)-(5) (providing that a business reimbursement plan is exempt from withholding requirements only if it is an "accountable plan" which (1) covers only expenses with a business connection, (2) requires expenses to be substantiated, and (3) requires the employee to return to the employer any amount paid in excess of substantiated expenses); *see also* Rev. Rul. 2006-56, 2006-2 C.B. 874 (ruling that "where an expense allowance arrangement has no mechanism or process to track allowances paid and routinely pays *per diem* allowances in excess of the federal *per diem* rates without requiring actual substantiation of all the expenses or repayment of the excess amount, all payments made under the arrangement will be treated as made under a nonaccountable plan").

-16-

Contrary to TransAm's appellate position, the ARB referenced the evidence Maddin proffered—his IRS tax records and a personal financial statement—and concluded it supported the ALJ's finding that Maddin had a net loss for the post-termination period. TransAm's objection appears to be based on the fact that Maddin did not submit direct evidence of his earnings and expenses during the relevant period. TransAm, however, offers no support for the proposition that direct evidence is necessary or required. Here, the ARB credited the evidence Maddin submitted and TransAm has not explained why that evidence is unreliable or that Maddin lacks credibility. Although TransAm argues it was not provided with an opportunity to challenge the evidence, the record shows it filed a Post-Trial Brief in Opposition to Backpay on January 3, 2013. In that brief, TransAm challenged Maddin's evidence of damages as speculative, a position the ALJ and the ARB obviously rejected. As to TransAm's complaint that it was unable to cross-examine Maddin, it offers no legal authority for the proposition that it was entitled to cross-examination. Neither does TransAm explain why Maddin's testimony could not be impeached with its own documentary evidence and why any such evidence could not be brought to the attention of the ALJ during the prior proceedings.

We also reject TransAm's argument that Maddin was not entitled to backpay with interest for the entire period between his firing and his reinstatement because of an alleged excessive delay in resolving the matter before

the DOL.  TransAm's assertions are wholly self-serving and its opening appellate brief contains no legal authority in support of its position.

**IV.    Conclusion**

TransAm's petition for review is **denied**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

No. 15-9504, *TransAm Trucking, Inc. v. Admin. Review Bd., U.S. Dep't. of Labor*

**GORSUCH**, Circuit Judge, dissenting.

A trucker was stranded on the side of the road, late at night, in cold weather, and his trailer brakes were stuck. He called his company for help and someone there gave him two options. He could drag the trailer carrying the company's goods to its destination (an illegal and maybe sarcastically offered option). Or he could sit and wait for help to arrive (a legal if unpleasant option). The trucker chose None of the Above, deciding instead to unhook the trailer and drive his truck to a gas station. In response, his employer, TransAm, fired him for disobeying orders and abandoning its trailer and goods.

It might be fair to ask whether TransAm's decision was a wise or kind one. But it's not our job to answer questions like that. Our only task is to decide whether the decision was an illegal one. The Department of Labor says that TransAm violated federal law, in particular 49 U.S.C. § 31105(a)(1)(B). But that statute only forbids employers from firing employees who "refuse[] to operate a vehicle" out of safety concerns. And, of course, nothing like that happened here. The trucker in this case wasn't fired for *refusing* to operate his vehicle. Indeed, his employer gave him the very option the statute says it must: once he voiced safety concerns, TransAm expressly — and by everyone's admission — permitted him to sit and remain where he was and wait for help. The trucker was fired only after he declined the statutorily protected option (refuse to operate) and chose instead to *operate* his vehicle in a manner he thought wise but his employer did

not. And there's simply no law anyone has pointed us to giving employees the right to operate their vehicles in ways their employers forbid. Maybe the Department would like such a law, maybe someday Congress will adorn our federal statute books with such a law. But it isn't there yet. And it isn't our job to write one — or to allow the Department to write one in Congress's place.

My colleagues suggest that the Department should be permitted to read the statutory phrase "refuse[] to operate" to encompass its exact opposite and protect employees who *operate* their vehicles in defiance of their employers' orders. They justify this unusual result on the ground that the statutory phrase is ambiguous and so we owe the Department deference under step two of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). But, respectfully, it seems to me *Chevron* is a curious place to turn for support given that the Department never argued the statute is ambiguous, never contended that its interpretation was due *Chevron* step two deference, and never even cited *Chevron*. In fact, the only party to mention *Chevron* in this case was TransAm, and then only in a footnote in its brief and then only as part of an argument that the statute is *not* ambiguous. We don't normally make arguments for litigants (least of all administrative agencies), and I see no reason to make a wholly uninvited foray into step two of *Chevron*land. *See Comsat Corp. v. FCC*, 250 F.3d 931, 938 n.7 (5th Cir. 2001); *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

Even taken on its own terms, too, I find myself unpersuaded by the argument my colleagues devise for their invocation of *Chevron* step two. They say the statute is ambiguous because some of its terms (like "operate") are not expressly defined by statute. Maj. Op. at 9. But, respectfully, my colleagues do not cite any precedent for the notion that the absence of a statutory definition is enough to render a statutory term ambiguous — and I am aware of none. In fact, there are countless cases finding a statute unambiguous after examining the dictionary definition of its terms. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 388-92 (2009); *Hackwell v. United States*, 491 F.3d 1229, 1233-37 (10th Cir. 2007).

Doing just that here, it seems to me that the statute is perfectly plain — and plainly doesn't capture the conduct here — just as TransAm suggests. The term "refuse" means "[t]o decline positively, to express or show a determination not to do something." 8 The Oxford English Dictionary 495 (2d ed. 1989). Meanwhile, "operate" means "[t]o cause or actuate the working of; to work (a machine, etc.)." 10 *id.* at 848. Putting this together, employees who voice safety concerns about their vehicles may *decline to cause those vehicles to work* without fear of reprisal. And that protection, while significant, just does not give employees license to *cause* those vehicles to work in ways they happen to wish but an employer forbids. Indeed, my colleagues' position would seem to require the addition of more than a few new words to the statute. In their view, an employee should be

-3-

protected not just when he "refuses to operate a vehicle" but also when he "refuses to operate a vehicle *in the particular manner the employer directs and instead operates it in a manner he thinks safe.*" Yet those words just aren't there; the law before us protects only employees who refuse to operate vehicles, *period.* Imagine a boss telling an employee he may either "operate" an office computer as directed or "refuse to operate" that computer. What serious employee would take *that* as license to use an office computer not for work but to compose the great American novel? Good luck.

To be sure, my colleagues invoke the statute's purposes — employee "health" and "safety" — and suggest the result they reach is consistent with them. After all, they note, the employee here who chose to defy his employer's instructions and drive his truck as he thought best didn't do so to write a novel or with some other esoteric end in mind, but because he bore safety concerns. Just the sort of employee safety concerns, my colleagues indicate, Congress intended to protect. Maj. Op. at 10.

Even supposing all this is true, though, when the statute is plain it simply isn't our business to appeal to legislative intentions. *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260 (1945) ("The plain words and meaning of a statute cannot be overcome by legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."). And it is a well-documented mistake, too, to

-4-

assume that a statute pursues its putative (or even announced) purposes to their absolute and seemingly logical ends. *See, e.g.*, *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1158 (10th Cir. 2010) (en banc); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 460-62 (2002). Especially to ends as ephemeral and generic as "health and safety." After all, what under the sun, at least at some level of generality, *doesn't* relate to "health and safety"? The fact is that statutes are products of compromise, the sort of compromise necessary to overcome the hurdles of bicameralism and presentment. And it is our obligation to enforce the terms of that compromise as expressed in the law itself, not to use the law as a sort of springboard to combat all perceived evils lurking in the neighborhood. Maybe Congress found it easier to agree that an employee has a right to sit still in response to his employer's order to operate an unsafe vehicle rather than try to agree on a code detailing when and how an employee can operate a vehicle in a way he thinks safe and appropriate but his employer does not. Maybe Congress would not have been able to agree to the latter sort of code at all. Or maybe it just found the problem too time consuming and other matters more pressing. Or maybe it just didn't think about the problem at all. Whatever the case, it is our job and work enough for the day to apply the law Congress did pass, not to imagine and enforce one it might have but didn't.

I respectfully dissent.