BACHARACH, J.,
dissenting.
Zen Magnets .asserts six challenges to the Consumer Product Safety Commission’s final rule establishing safety standards for magnet sets:
1. The Commission lacked substantial evidence in finding that the rule is reasonably necessary to avoid an unreasonable risk of injury.
2. The Commission’s cost-benefit analysis was not supported by substantial evidence,
3. The Commission lacked substantial evidence in finding that the rule promotes the public interest.
4. The Commission did not adequately consider the magnets’ usefulness in education, research, and art,
5. The rule constitutes a ban, which required additional findings.
6. The final rule impermissibly expanded the definition of the covered products.
I would reject these challenges and deny the petition for review. As a result, I respectfully dissent.
I. Sufficiency of the Evidentiary Support for the Commission’s Findings
Zen Magnets challenges the adequacy of the evidentiary support for the Commission’s findings on reasonable necessity, an unreasonable risk of injury, balancing of costs and benefits, and consideration of the public interest. For these challenges, we consider only whether the findings were based on substantial evidence. See 15 U.S.C. § 2060(c) (“The consumer product safety rule shall not be affirmed unless the Commission’s findings under sections 2058(f)(1) and 2058(f)(3) of this title are supported by substantial evidence on the record taken as a whole.”). In my view, such evidence existed.
*1156 A. Our Framework for Review
“[0]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole.” Sidabutar v. Gonzales, 503 F.3d 1116, 1122 (10th Cir. 2007) (alteration in original) (quoting Uanreroro v. Gonzales, 443 F.3d 1197, 1204 (10th Cir. 2006)). The evidence is considered “substantial” if it is relevant and might reasonably lead to a given finding. TransAm Trucking, Inc. v. Admin. Review Bd., 833 F.3d 1206, 1209 (10th Cir. 2016). When applying this test, we follow three steps:
1. “[L]ook to the statute and legislative intent to determine the criteria necessary to establish the required findings.” [1]
2. Ascertain “the relevant portions of the record ... primarily by reference to pages cited by the parties.”[2]
3. Evaluate the evidence and reject the agency’s finding only if “any reasonable adjudicator would be compelled to conclude to the contrary.”[3]
B. Risk of Injury and Reasonable Necessity
The Commission could adopt the rule only by finding that
• the product creates an unreasonable risk of injury and
• the rule is reasonably necessary in light of that risk.
15 U.S.C. § 2058(f)(3)(A). In my view, the record supports the Commission’s findings on both the unreasonable risk of injury and reasonable necessity for the rule.
Unreasonable Risk of Injury. A risk of injury is unreasonable when it exceeds “the harm the regulation imposes upon manufacturers and consumers.” Southland Mower Co. v. Consumer Prod. Safety Comm’n, 619 F.2d 499, 508-09 (5th Cir. 1980) (quoting Aqua Slide, 569 F.2d at 839); see also Mathew E. Hoffman, The Consumer Product Safety Commission: In Search of a Regulatory Pattern, 12 Colum. J.L. & Soc. Probs. 393, 403 (1976) (“Basically, then, the cost of the Commission-imposed standards must be weighed against the cost of their absence.”).
The Commission considered the risk posed by the magnet sets in an unregulated market and concluded that the magnet sets pose an unreasonable risk of injury and death. 79 Fed. Reg. at 59,962; 59,978-82. Zen Magnets argues that this finding lacked substantial evidence because the Commission relied on empirical data lacking enough certainty.[4] The majority agrees *1157 with Zen Magnets, reasoning that because 90% of the injury data only “possibly” involved the covered magnets, the data was too uncertain and imprecise to constitute substantial evidence for the Commission’s findings on the risk of injury. But in addition to the empirical data, the Commission relied on three other sources of information.
The first was a survey of doctors, which showed a sharp increase in injuries caused by ingestion of magnets from 2008 to 2012. Record at 7719-20 (Statement of Dr. Maria Oliva-Hemker).
The second consisted of testimony about the results of a study published in the Journal of Pediatric Gastroenterology and Nutrition. Id. at 7644 (Statement of Dr. Maria Oliva-Hemker). This study concluded that incidents had spiked in 2009, when the magnet sets became popular. Id. at 7644-48.
The third consisted of comments by medical experts who regarded the statistical data as “a serious under estimation.” Id. at 7619.
These sources support the Commission’s findings that injuries increased when the magnet sets entered the market and that the magnets posed an unreasonable risk of injury.
Zen Magnets responds with two arguments: (1) the risk was reasonable because consumers were aware of the dangers, and (2) the risks were remote. These arguments do not vitiate the evidentiary support for the Commission’s findings.
The Commission concluded that many children are unlikely to appreciate the dangers from ingesting the magnet sets. 79 Fed. Reg. at 59,969-71. For this conclusion, the Commission pointed to studies showing that caregivers are unable to constantly monitor children, older children will “test limits and bend rules,” and bit-terants would not deter initial ingestions. Id.
The Commission also rejected the argument that the risk of injury was remote, noting that “there were an estimated 2,138 injuries treated in U.S. hospital emergency departments from 2009 through June 2012.” Id. at 59,978; see also id. at 59,962 (“We do not agree that this is a low figure for injuries.”).
Zen Magnets downplays the risk, citing favorable comparisons to the risk from harmless items like balloons. But these comparisons were far from unanimous. In my view, the record sufficed for the Commission’s finding of an unreasonable risk of injury.
Reasonable Necessity in Light of the Risk. Zen Magnets also denies the existence of substantial evidence for Commission’s finding that the new rule was reasonably necessary in light of the risk. I regard the evidence as sufficient.
Zen Magnets argues that the rule effectively bans the magnet sets, which is excessive in light of the risk of injury. But as discussed below, the Commission reasonably classified the rule as a safety standard rather than a ban.
Apart from characterizing the rule as a ban, Zen Magnets asserts that the rule is unnecessary in light of its costs. This assertion is neither developed nor persuasive. The Commission quantified the economic loss from the rule, projecting $6 *1158 million in lost surplus. Id. at 59,981-82. In addition, the Commission acknowledged that • consumers would lose some useful features of the covered magnets. Id. But the Commission concluded that the rule was reasonably necessary to curb injuries. Id. at 59,988. That conclusion was reasonable based on the record.
C. The Cost-Benefit Analysis
In conducting the cost-benefit analysis, the Commission relied on injury data from 2009 through June 2012. Zen Magnets argues that this data was outdated because the market changed dramatically in mid-2012, when the Commission announced future efforts to regulate magnet sets. The majority concludes that the data’s time-frame is potentially problematic.
I would not reach the time-frame argument. During the notice-and-comment period, no one commented on the Commission’s choice of a time-period for the cost-benefit analysis. In my view, the absence of public comment on this issue results in waiver of the challenge.
The Necessity of Public Comment. As the majority notes, a party challenging an agency rule must generally present its concerns to the agency during the rule-making process. Maj. Op. at 1151 n.ll. “In a review of the decision of an administrative agency, a party waives its right to appeal an issue if it fails to object through comments or documents in the record.” Nutraceutical Corp. v. Von Eschenbach, 459 F.3d 1033, 1041 n.9 (10th Cir. 2006).
Because no one objected to the Commission’s choice of a time-period, the Commission argues that this issue has been waived. Neither Zen Magnets nor :the majority suggests otherwise. In fact, Zen Magnets fails to address waiver in either of its appeal briefs.
We ordinarily would go no further, for we generally take the parties’ issues as they are presented to us. Greenlaw v. United States, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008). Instead, the majority concludes that we may address Zen Magnets’ time-frame argument because a claim involving obvious defects is not waived even in the absence of a comment during the notice-and-comment process. Maj. Op. at 1151 n.ll.
So, is the Commission’s reliance on data from 2009 through June 2012 an obvious flaw in the Commission’s cost-benefit analysis? The majority answers “yes,” reasoning that the injury rate substantially declined in 2012. Id.
The Commission- acknowledged the decline in injuries, attributing the decline to a 2012 announcement of future rulemaking to curtail ingestions of high-powered magnets. Record at 8087. But in the Commission’s view, the announcement “significantly altered the state of the market” and the prior environment “represent[ed] the best approximation of how the market would have operated in the absence of [the Commission’s] intervention.” Final Rule: Safety Standard for Magnet Sets, 79 Fed. Reg. 59,962, 59,978 (Oct. 3, 2014) (codified at 16 C.F.R. §§ 1240.1-1240.5). Thus, the Commission chose a time-period, 2009 through June 2012, that reflected the injury rate when sellers had been allowed to flood the market with high-powered magnets. Id.
I do not think that this rationale is obviously defective. In any event, neither Zen Magnets nor the majority explains what is wrong with the Commission’s explanation. I would hesitate to reject the Commission’s explanation as “obviously” flawed in the absence of at least some argument by Zen Magnets.
D. The Public Interest
The rule could be adopted only if it promoted the public interest. 15 U'.S.C. § 2058(f)(3)(B). The Commission found that this requirement had been met. 79 Fed. Reg. at 59,988 (“The regulations in *1159 this part are in the public interest because they would reduce deaths and injuries associated with magnet sets in the future.”). Zen Magnets disagrees, contending that this finding was unsupported by substantial evidence and that the Commission ignored the magnet sets’ utility as a¡n art medium. I disagree.
Determination of the public interest involves policy-making, which lies within the Commission’s expertise. See Teresa M. Schwartz, The Consumer Product Safety Commission, 51 Geo. Wash. L. Rev. 32, 34 n.5 (1982) (“Such general statutory guidelines delegated to the Consumer Product Safety Commission ... wide discretion to balance broad social goals and the competing claims of private interests in selecting products to regulate and in defining the contents of the regulation.”). Applying this expertise, the Commission acknowledged the utility of magnet sets but found greater danger through injury and death. See p. 1156, above. In assessing the public interest this way, the Commission did not err.
II. The Magnets’ Usefulness
The majority concludes that the Commission inadequately considered the magnets’ usefulness for education, research, and art. I respectfully disagree.
The Commission noted that some com-menters had expressed concern that the new rule would eliminate the use of high-powered magnets in education and research. 79 Fed. Reg. at 59,967. Addressing these concerns, the Commission stated that many high-powered magnets would continue to be used in education and research:
Magnets have long played a role in education. However, the specific products that are covered by the rule have been on the market only since 2008. The rule will cover only “any aggregation of separable magnetic objects that is a consumer product intended, marketed or commonly used as a manipulative or construction item for entertainment, such as puzzle working, sculpture building, mental stimulation, or stress relief.” Magnets that are not subject to the restrictions of the rule would continue to be available. For example, less powerful magnets are sometimes included in science kits to demonstrate magnetism. In addition, high-powered magnets that serve industrial and commercial needs would not be covered by the rule.
Id. This explanation was sufficient.
Zen Magnets also argues that the Commission overlooked the magnets’ use as an art form. The Commission acknowledged this use and explained that “[m]agnet sets that comply with the rule could serve some purposes of magnet sets that are currently available.” Id. Zen Magnets does not identify any shortcomings in this explanation.
The majority states that the Commission must provide an explanation that allows meaningful review. Maj. Op. at 1153. In my view, the' Commission’s explanation was sufficient for meaningful review.
III. Classification as a Safety Standard Rather than a Ban
Zen Magnets alternatively argues that the safety standard is functionally a ban. The Consumer Product Safety Act distinguishes between “safety standards” and “bans,” but does not define either term. Because the statute is ambiguous and administered by the Commission, we must defer to the Commission’s rules if they involve reasonable interpretations of statutory ambiguities. The Commission’s classification of its rule as a safety standard, rather than a ban, is reasonable and entitled to deference.
A, The Commission’s Administration of the Consumer Product Safety Act
The Commission administers the Consumer Product Safety Act, and Congress *1160 expressly instructed the Commission to use the notice-and-comment process to adopt safety rules. 15 U.S.C. § 2058(d)(2). Therefore, Chevron deference applies to the Commission’s interpretation of the Consumer Product Safety Act. See United States v. Mead Corp., 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (“[A] very good indicator of delegation meriting Chevron treatment [is] express congressional authorizations to engage in the process of rulemaking or adjudication that produces the regulations or rulings for which deference is claimed.”); Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (“We have long recognized that considerable weight should be accorded to an executive department’s construction of a statutory scheme it is entrusted to administer.... ”).
As a consequence, we undertake the two-step Chevrorirdeierence analysis. “When Congress has spoken to the precise question at issue, we must give effect to the express intent of Congress. If the statute is silent or ambiguous, however, we defer to the agency’s interpretation, if it is a permissible one.” S. Utah Wilderness All. v. Dabney, 222 F.3d 819, 824 (10th Cir. 2000) (citing Chevron, 467 U.S. at 842-44, 104 S.Ct. 2778).
B. Ambiguity of the Statutory Provision
We first consider whether Congress has spoken to the question at issue. Here, Congress failed to specify how to distinguish bans from safety standards. This omission left room for the Commission to exercise its discretion.
The Act contains separate sections for safety standards and bans, but does not give content to those terms. Section 2056(a) authorizes the Commission to adopt consumer product safety standards, which include “[Requirements expressed in terms of performance requirements.” 15 U.S.C. § 2056(a)(1). In contrast, § 2057 allows the Commission to ban a consumer product if “no feasible consumer product safety standard ... would adequately protect the public from the unreasonable risk of injury associated with such product.” 15 U.S.C. § 2057. There is no further discussion of the term “ban.”
These provisions are ambiguous because they do not distinguish bans from safety standards. A safety standard that sets performance requirements can always be re-framed as a “ban” on nonconforming products. But surely Congress did not mean to treat every safety standard as a ban, for the law states that the Commission can create performance requirements through safety standards. Thus, Congress ruled out the possibility that every prohibition on the sale of nonconforming products would constitute a ban. Instead, Congress allowed the Commission to draw a different line: Some safety standards that create performance requirements must qualify as safety standards rather than bans.
C. The Commission’s Distinction Between Bans and Safety Standards
The Commission classified its rule— which prohibits the sale of small magnets with a flux index greater than 50 kG2mm2 —as a safety standard. This interpretation of the statute is reasonable and entitled to deference.
Under Chevron, we cannot “substitute [our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.” Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Such judicial micromanagement would undermine an important rationale for deferring to administrative agencies: “to ‘achieve predictable (and relatively litigation-free) administration of *1161 the vast body of complex laws committed to the charge of executive agencies,’ by ‘assuring] that reviewing courts will accept reasonable and authoritative agency interpretation of ambiguous provisions.’” S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enf't., 620 F.3d 1227, 1235-36 (alteration in original) (quoting Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 296, 129 S.Ct. 2458, 174 L.Ed.2d 193 (2009) (Scalia, J., concurring)). Thus, we must defer to the Commission’s classification of the rule as a “Safety Standard for Magnet Sets.” 79 Fed. Reg. 59,962-01; 16 C.F.R. pt. 1240.
Zen Magnets points out that members of the Commission and public have sometimes referred to the rule as a ban. E.g., Petitioner’s Reply Br. at 14. But the Commission definitively expressed its view that the rule is a safety standard, rather than a ban, and we should defer to the Commission’s characterization.[5]
IV. Expansion of the Definition of Products
Zen Magnets also contends that the Commission expanded the definition of the regulated products from what had been proposed in the notice of proposed rule-making. Like the majority, I would reject this contention.
When an administrative agency uses the notice-and-comment process, the final rule must constitute a “logical outgrowth” of the proposed rule. Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007). This requirement ensures fair notice of what rule the agency might ultimately adopt. Id. Thus, a final rule is a logical outgrowth of a proposed rule if the final rule was “reasonably foreseeable” when the rule was proposed. Id. at 175, 127 S.Ct. 2339.
Zen Magnets argues that the final rule deviated too far from the proposed rule, violating the Administrative Procedure Act, 5 U.S.C. § 553. I agree with the majority’s rejection of this argument because the final definition of regulated products logically grew out of the proposed definition.
Zen Magnets challenges the change to the proposed definition of the magnet sets to be regulated. (The altered text is italicized.)
• Proposed Rule: “any aggregation of separable, permanent magnetic objects that is a consumer product intended or marketed by the manufacturer primarily as a manipulative or construction desk toy for entertainment, such as puzzle working, sculpture building, mental stimulation, or stress relief.” 77 Fed. Reg. 53,783.
• Final Rule: “[a]ny aggregation of separable magnetic objects that is a consumer product intended, marketed, or commonly used as a manipulative or construction item for entertainment, such as puzzle working, sculpture building, mental stimulation, or stress relief.” 16 C.F.R. § 1240.2(b).
The final rule reaches further than the proposed rule by adding the phrase “commonly used.”
The magnets’ common use does not necessarily reflect manufacturers’ intentions, for individuals might use magnet sets differently than manufacturers intend. For instance, assume that Zen Magnets advertised only in high school science catalogs and websites, labeled the magnet sets “educational products,” and warned that the *1162-1172 magnets are not safe for use as toys. With these assumptions, we could infer that Zen Magnets intended purchasers to use the magnet sets as educational products. But if consumers chose to use the magnets as toys, the common use would diverge from Zen Magnets’ intended and marketed uses. Thus, the final rule differs from the proposed rule and we must consider whether the final rule is a “logical outgrowth” of the proposed rule.
This determination generally hinges on the salience of the changed language to a reader of the proposed rule. Salience is a product of
• the prominence of the issue in the proposed rule[6] and
• whether the issue was flagged as something that might be changed in the eventual rule.[7]
Here, both factors indicate that the final rule was a logical outgrowth of the proposed rule, for the Commission unambiguously stated that the definition of “magnet set” was subject to change and invited comments on the definition. See Notice of Proposed Rulemaking: Safety Standard for Magnet Sets, 77 Fed. Reg. 53,781, 53,787 (Sept. 4, 2012) (“The Commission seeks comment on the scope of the products proposed to be covered by this proposed rule and, in particular, whether risks are presented by magnets in science kits or craft and hobby kits no matter how they are age graded and labeled”).
In this manner, the Commission provided notice to interested parties that the definition of “magnet sets” might be broadened or narrowed. Such notice was sufficient. See CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1081 (D.C. Cir. 2009) (“We have found that a final rule represents a logical outgrowth where the [notice of proposed rulemaking] expressly asked for comments on a particular issue or otherwise made clear that the agency was contemplating a particular change.”); Alto Dairy v. Veneman, 336 F.3d 560, 570 (7th Cir. 2003) (holding that notice was sufficient because industry “insiders” would realize that an issue was at stake).
V. Conclusion
Because I would not disturb the Commission’s rule, I respectfully dissent.

. Aqua Slide ‘N’ Dive Corp. v. Consumer Prod. Safety Comm’n, 569 F.2d 831, 838 (5th Cir. 1978).

. Id.

. Sidabutar, 503 F.3d at 1125.

. Zen Magnets also contends that the number of ingestions did not increase when the magnets became available in 2009. But the record contains contrary evidence. For example, Dr. Oliva-Hemker testified about a clinical case survey conducted by the North American Society for Pediatric Gastroenterology, Hepatol-ogy and Nutrition. Record at 7641-44. She observed that the study had shown an increase in the ingestion of magnets when high-powered magnet sets flooded the market in 2009:
It was shown that during [a] ten year period ... there were more than 16,000 emergency department visits for magnet related ingestion’s [sic], and such visits in aggregate overall increased more than eight-fold.
Importantly, it shows that magnet ingestion’s [sic] began to increase in 2009. This was following a drop in cases from 2007 to 2009. We speculate that the drop in cases from 2007 to 2009 is attributed to the Commission’s recall of numerous toy prod *1157 ucts that contained high powered magnets and adherence to toy safety standards.
The increase in magnet ingestion's [sic] correlates with 2009 being the first year of significant sales of high powered magnet sets. For example, based on data available from one company alone, 1.5 million units of Bucky Balls were sold between 2009 and 2011, and other companies have similar high sales during that time period.
Id. at 7647-48.

. In arguing that the safety standard was actually a ban, Zen Magnets maintains that the Commission did not make findings to support aban. See 15 U.S.C. §§ 2057(2), 2058(f)(3)(C). Because the rule was not a ban, I would not address this argument.

. See, e.g., AFL-CIO v. Donovan, 757 F.2d 330, 339 (D.C. Cir. 1985) (noting that language that was altered by the final rule "appeared [in the proposed rule] only as part of the entire set of Service Contract Act regulations ..., which was reprinted in full in some forty pages of the Federal Register”).

. See CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1081 (D.C. Cir. 2009) (explaining that when the notice of proposed rulemaking expressly asked for comments on an issue, changes to the relevant language were a logical outgrowth).